**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

| | |
|---|---|
| **JAMES BROWN,** *on behalf of himself and all others similarly situated*, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **CAUSE NO. 3:21-cv-00576-HAB-SLC** |
| | ) |
| **WELLPET LLC,** | ) |
| | ) |
| Defendant. | ) |

## REPORT AND RECOMMENDATION

Plaintiff James Brown, a resident of Mishawaka, Indiana, filed this case on behalf of himself and all others similarly situated, advancing state-law claims of private nuisance, public nuisance, and negligence against Defendant WellPet LLC ("WellPet"), a manufacturer of pet food.[1] (ECF 7). Brown alleges that his residential property is repeatedly and continuously invaded by noxious odors emitted from WellPet's Mishawaka manufacturing facility, which is located within one mile of his residence, such that the emissions interfere with his use and enjoyment of his property and cause diminished property values for homeowners. (*Id.*). He seeks compensatory damages and injunctive relief to abate the emissions. (*Id.*).

Now before the Court is Brown's Motion for Class Certification filed on August 31, 2022 (ECF 26); WellPet's Motion to Exclude Plaintiff's Expert Dr. Mark P. Cal filed on September 30, 2022 (ECF 30); WellPet's Motion to Strike Improper Supplemental Expert Report of Mark Cal filed on October 21, 2022 (ECF 38); and Brown's Motion to Exclude Defendant's Expert,

---

[1] Diversity jurisdiction exists under The Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d) ("CAFA"). (*See* ECF 1 ¶¶ 12-21).

Tony Schroeder filed on November 4, 2022 (ECF 40).[2] On November 22, 2022, District Judge Holly A. Brady referred these motions to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b) and Northern District of Indiana Local Rule 72-1 for the issuance of a report and recommendation. (ECF 45). The motions are now ripe for adjudication. (ECF 31-35, 37, 39, 41-42, 44, 46).

Having duly considered the motions, I CONCLUDE that WellPet's motion to strike (ECF 38) should be GRANTED IN PART and DENIED IN PART, that the parties' respective motions to exclude each other's experts (ECF 30, 40) should be DENIED; and that Brown's motion for class certification (ECF 26) should be DENIED WITHOUT PREJUDICE.

## I. PROCEDURAL BACKGROUND

Brown filed this putative class action against WellPet in St. Joseph County Superior Court on June 14, 2021, alleging that WellPet's operation and maintenance of its pet food manufacturing facility located at 1011 West 11th Street, Mishawaka, Indiana (the "Facility"), has caused noxious odors to invade the properties of the putative class. (ECF 7 ¶¶ 1-2). The complaint seeks compensatory and punitive damages, attorneys' fees, declarations that the odors constitute a nuisance and that WellPet was negligent, injunctive relief, and "further relief, both general and specific." (*Id.* at 15-16). WellPet timely removed the action to this Court pursuant to CAFA. (ECF 1 ¶¶ 13, 14).

---

[2] WellPet also filed an Unopposed Motion to Amend on October 13, 2022 (ECF 33), seeking to replace its original Memorandum in Opposition to Plaintiff's Motion for Class Certification filed on September 30, 2022 (ECF 32), with an Amended Memorandum in Opposition to Plaintiff's Motion for Class Certification (ECF 33-1) due to "new information recently provided by the Indiana Supreme Court Disciplinary Commission and counsel for [Brown] that renders certain statements in [WellPet's] original Memorandum inaccurate." (ECF 33 at 1). Given that the motion to amend is unopposed, I have considered the amended memorandum (ECF 33-1), rather than the original memorandum (ECF 32), in reaching the recommendation on Brown's motion for class certification.

On October 18, 2021, the parties filed a proposed discovery plan with proposed deadlines, agreeing to bifurcate discovery into a class discovery phase where the initial phase of discovery would be limited to class certification issues ("Phase I"), followed by Brown filing a motion for class certification. (ECF 19 ¶ 4). They further agreed that after the Court rules on the class certification issue, a discovery plan would be entered for the merits phase of the litigation ("Phase II"). (*Id.*).

On October 19, 2021, the Court entered a Scheduling Order adopting the parties' proposed discovery plan and deadlines, bifurcating the discovery into Phase I and Phase II. (ECF 20). The Court adopted the following deadlines: April 29, 2022, for Brown's service of expert reports, and June 29, 2022, for WellPet's service of expert reports, with "[s]upplementation under [Federal Rule of Civil Procedure] 26(e) due every six weeks until trial"; August 1, 2022, for all Phase I discovery; and August 31, 2022, for any motion for class certification. (*Id.* ¶¶ 1, 4, 5). The Court stated that it intends to enter a Phase II scheduling order after the ruling on class certification. (*Id.* ¶ 1).

On May 1, 2022, Brown served a "Preliminary Report for Class Certification" completed by his expert, Mark P. Cal, Ph.D., P.E., BCEE ("Cal"), on April 26, 2022 (the "Preliminary Report"). (ECF 31-2 at 2, 17; ECF 38 at 1). Subsequently, WellPet served Brown with an "Expert Report" issued on June 29, 2022, by its retained expert, Tony Schroeder, CCM, QEP, CM (the "Rebuttal Report"), to rebut Cal's opinions. (ECF 32-4 at 2).

On August 31, 2022, Brown filed the motion for class certification (ECF 26), together with a supporting memorandum (ECF 27) and Cal's Preliminary Report (ECF 27-5). WellPet filed a response in opposition on September 30, 2022, attaching Schroeder's Rebuttal Report.

(ECF 32, 32-4). That same day WellPet filed a motion to exclude Cal's opinions and testimony pursuant to Federal Rule of Evidence 702 and *Daubert* principles.[3] (ECF 30, 31). Brown timely filed a response in opposition to the motion to exclude (ECF 35), attaching in support a Declaration of Dr. Mark P. Cal in Opposition to Defendant's Motion to Exclude dated October 14, 2022 (the "Declaration") (ECF 35-4).

On October 21, 2022, WellPet filed a motion to strike the Declaration, asserting it is an improper supplement to Cal's Preliminary Report. (ECF 38). In turn, on November 4, 2022, Brown filed a motion to exclude Schroeder's testimony and Rebuttal Report, asserting that Schroeder's opinions amount to improper speculation as to Cal's credibility, which is not expert testimony and does not assist the Court in deciding class certification. (ECF 40, 41). As stated earlier, the referred motions are all ripe for adjudication.

## II. FACTUAL BACKGROUND

### A. WellPet Announces a Facility Site Expansion in March 2021

WellPet owns and operates the Facility, which has operated as a pet food manufacturing facility since 1972. (ECF 7 ¶¶ 8, 11; ECF 32-3 ¶ 3). WellPet took ownership of the Facility in 2009 and has implemented various odor mitigation technologies over the years. (ECF 32-2 at 6; ECF 32-3 ¶¶ 4, 5). In 2016, WellPet installed its current odor mitigation system, an absorption system that utilizes vaporized compounds to mitigate odors. (ECF 32-2 at 6; ECF 32-3 ¶ 5). In March 2021, WellPet announced its plan to install a new odor mitigation technology, an IonO2x odor treatment system, to further reduce odors in conjunction with a site expansion. (ECF 32-3 ¶ 6). Installation of the IonO2x odor system, however, has been delayed by "engineering and long

---

[3] *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

equipment lead times." (*Id.*). WellPet has invested $2.7 million into the project to date and anticipates the installation of the IonO2x odor system to be completed by March 2023. (*Id.*).

### B. Brown's Counsel Sends Out Letters to Households Located Within One Mile of the Facility in April 2021

In April 2021, shortly after WellPet announced its site expansion plans, Brown's counsel sent letters to approximately 2,200 households located within one mile of the Facility. (ECF 32-5; ECF 32-6 at 6; ECF 32-7). The letters informed recipients that counsel was "investigating the possibility of litigation due to offensive odors coming from the WellPet facility." (ECF 32-5). The letters further stated: "Due to your proximity to the facility, you may have experienced noxious odors from this facility," and "[o]dors that interfere with the use and enjoyment of your home may constitute a nuisance and entitle you to compensation." (*Id.*). Counsel offered a free consultation regarding the issue and stated that recipients could learn more about their rights by completing and returning an enclosed "Data Sheet." (*Id.*). Counsel received Data Sheets back from 56 of the 2,200 letters. (ECF 27-3). Of these respondents, 50 reported complaints about odors, while 6 indicated that they did not experience odors associated with WellPet or that the odors were bearable. *(Id.)*.

### C. Brown Submits a Data Sheet to Counsel

Brown was one of the respondents to counsel's letters. (ECF 27-3 at 8). Brown has rented a home at 334 W. 6th Street in Mishawaka since March 2014 and is presently a month-to-month tenant. (ECF 32-9 at 13; ECF 32-10). In his Data Sheet, Brown described the odors as "a very nasty trashy smell that makes you want to vomit," stating his family "can't open windows or enjoy our own back yard in [the] summer because [of] the smell." (ECF 27-3 at 8).

5

*D. Brown Files This Putative Class Action Against WellPet on June 14, 2021*

On June 14, 2021, Brown filed this putative class action against WellPet, seeking to certify a class defined as: "All owners/occupants and renters of residential property within one mile (1.0) of the Facility property boundary." (ECF 7 ¶ 32 (bold emphasis omitted)).

At his later deposition, Brown testified that he first noticed the odors in Spring 2014 when he moved into the rental home, and that they occur at least twice a week, at sporadic times of the day. (ECF 32-9 at 13, 16; *see also id.* at 14 ("[T]he air is not up to par . . . for certain amounts of time on certain days.")). He further testified that his family enjoys spending time in their backyard, including dining, playing with the children, lawn work, and walking their dogs, but have "been abruptly stopped from those activities because . . . of the smells" at times, causing them to "move [their] activities inside with the windows closed." (*Id.* at 14-15).

Brown resides in a "mixed use" neighborhood, containing residential, industrial, and commercial properties, but states that he has never experienced odors from a source other than WellPet at his home. (*Id.* at 17, 24). He did acknowledge that there is a wastewater treatment plan in the area, but stated that he only experiences odors from it when "[a]ctually down by the [wastewater treatment] facility." (*Id.* at 19 ("I've never once been at my house and smelled anything from the wastewater plant.")). He admits that he does not have a way to determine the exact source of the odors he experiences at his home, but testified that "it's kind of one of those obvious situations" in that WellPet is "the only pet food facility in the general area that's creating the fumes." (*Id.* at 17). Brown could not identify any "losses" he incurred as a result of the odors "[o]ther than time with [his] family . . . ." (*Id.* at 22).

6

*E. Mishawaka Residents Complain About the Odors, and*
*the City Issues WellPet a Citation on June 24, 2021*

Residents in the area complained about noxious odors coming from the Facility to the City of Mishawaka and the Indiana Department of Environmental Management. (ECF 7 ¶¶ 17, 22). On June 24, 2021, the City of Mishawaka issued WellPet a citation for violation of Public Nuisance Ordinance 30-47-9 ("Any portion of real property or any personal property which emits an unwholesome odor."). (ECF 27-1 at 1-5). WellPet violated that same ordinance at least ten more times between June 29, 2021, and April 7, 2022. (*Id.* at 5-7).

*F. Brown's Expert, Cal, Issues His Preliminary Report in April 2022*

Brown's counsel retained Cal "to investigate the appropriateness of using atmospheric dispersion modeling, and more specifically, *AERMOD*, to analyze the impacts of nuisance level odors on the community near [the Facility.]" (ECF 27-5 at 2). Cal issued his Preliminary Report on April 26, 2022, reaching the following conclusions and opinions:

1. WellPet, LLC operates an industrial pet food manufacturing facility. Pet food ingredients include fish, lamb, chicken, potatoes and other vegetables.

2. Due to the nature of their ingredients, pet food manufacturing processes may emit odorous compounds. Uncontrolled odorous compounds may leave the facility boundary and impact nearby properties.

3. *AERMOD* is the preferred atmospheric dispersion model used by local, state and federal regulatory agencies and in non-regulatory situations, such as modeling of odor dispersion. The maximum effective range for AERMOD is 31-miles (50-km), which is within the proposed class area.

4. Atmospheric dispersion of odorous compounds from the facility can be modeled using data obtained from publicly available sources, estimated or measured air emissions, local meteorological data and terrain data.

5. A detailed atmospheric dispersion modeling analysis centered around the facility can determine the frequency, intensity and location of nuisance level odors within the proposed class area. This would allow for a determination of which properties may be impacted by odor emissions from the facility and to what

extent.

(ECF 27-5 at 2, 12). Cal indicated that he reached these conclusions and opinions based on "a review of documentation provided by [Brown's] counsel . . . , technical literature, and [his] 34-years of experience in air quality engineering . . . ." (*Id.* at 12).

>    *G. WellPet's Expert, Schroeder, Issues His Rebuttal Report in June 2022*

WellPet's counsel retained Schroeder to "review and offer comments on [Cal's Preliminary Report]." (ECF 31-6 at 4). On June 29, 2022, Schroeder issued his Rebuttal Report, reaching the following conclusions and opinions:

>    1) Dr. Cal has not demonstrated with a reasonable degree of scientific certainty using modeling that residents located within a 1 mile radius of the [Facility] are similarly impacted, or even impacted at all, by odors from the [Facility]. Dr. Cal provides a map in Figure 1 of his report showing locations of survey responses communicated to [Brown's] counsel within a circle showing a 1 mile radius around the [Facility]. There is no discussion within the report that provides any scientific rationale for the basis of the 1 mile radius proposed for the class area.

>    2) Dr. Cal claims a detailed modeling analysis <u>can</u> determine the frequency, intensity and location of nuisance level odors within the proposed class area. But Dr. Cal does not do any such modeling analysis and his report does not provide recommendations on what specific data should be used to conduct the modeling (e.g., emission rates), which model options should be selected, or what assumptions must be made in the post processing of the data. Additionally, the frequency, intensity, and location of odors would not necessarily be sufficient to determine if an individual would consider odor impacts a nuisance, even if this modeling had been done.

>    3) Dr. Cal's AERMOD outputs shown in Figures 2 and 3 of his report do not represent modeling of the area surrounding the [Facility] and appear to show modeling conducted of an area in Massachusetts unrelated to this case. These figures simply show typical contour plots generated using AERMOD output concentrations with no bearing on the proposed class in Mishawaka. The figures show that it is common to see varying modeled concentrations both in terms of direction and distance from a facility, with concentrations generally decreasing with distance from a source. Dr. Cal's figures confirm that all locations within a 1 mile radius of an emissions source would not be expected to be similarly impacted.

8

4) An independent wind rose analysis conducted by Trinity [Consultants] determined that the wind does not blow in all directions with equal frequency in the area. Therefore, any odors that might leave the [Facility] would not impact all locations within a 1 mile radius with equal frequency and therefore all locations within a 1 mile radius would not be similarly impacted. For this reason, a proposed class area that is circular in shape does not properly account for those variations, inaccurately characterizing all locations within the proposed class area as similarly impacted. This observation is further supported by the distribution of survey responses shown in Figure 1 in Dr. Cal's report, which are not circular in shape.

(*Id.* at 4, 12). In developing his Rebuttal Report, Schroeder relied on Cal's Preliminary Report, the complaint in this matter, the Data Sheets, citations issued by the City of Mishawaka, meteorological data from the Mishawaka area, several publications, and a wind rose analysis conducted by Schroeder's firm. (*Id.* at 10-12, 18).

### H. On August 31, 2022, Brown Files the Motion for Class Certification and Amends His Proposed Class Definition

On August 31, 2022, Brown filed his motion for class certification. (ECF 26). In the motion, Brown amended his proposed class definition to the following:

All owners/occupants and renters of residential property within the area bordered on the west by Dale Ave, on the north by Lincoln Way Hwy, on the east by S Church St/Union St (between Lincoln Way highway and E 13th St) and S Main St (between E 13th St and Dragoon Trail), and on the south by Dragoon Trail.

("the Class," "the Class members," or "the Class area"). (ECF 27 at 5 (bold emphasis omitted); *see also* ECF 27-4 ¶ 5). Brown states that this proposed Class area was determined by his "pre-suit investigation" and is "further supported by documents and information obtained during discovery." (ECF 27 at 5). Brown indicates that based on the most recent available census data, there are 2,104 households in the Class area. (ECF 27-4 ¶ 6). On the map of the Class area submitted by Brown (ECF 27 at 5), copied below, there appears to be one respondent outside of the Class area, but the remaining respondents are within the Class area.

9



(*Id.*).

*I. On October 17, 2022, Brown Files Cal's Declaration in*
*Opposition to WellPet's Motion to Exclude Cal's Opinions*

After Brown filed his motion for class certification, WellPet filed a motion to exclude

Cal's testimony and Preliminary Report. (ECF 30). In response, Brown submitted a brief in

opposition, together with Cal's Declaration. (ECF 35, 35-4). WellPet then moved to strike the

Declaration "as an improper and untimely attempt to supplement Cal's [Preliminary Report] with

new and inadmissible information and opinions." (ECF 38). In turn, Brown filed a motion to

exclude Schroeder's testimony and Rebuttal Report. (ECF 40). As already stated, these motions

are all ripe for ruling. I will address the expert-related motions first, beginning with the motion to

strike, and then turn to the motion for class certification.

10

### III. WELLPET'S MOTION TO STRIKE IMPROPER SUPPLEMENTAL EXPERT REPORT OF MARK CAL

*A. Applicable Law*

If a party wants to introduce an expert opinion at trial, the party must give the other party notice pursuant to Federal Rule of Civil Procedure 26(a)(2). The expert disclosure must include the identity of the expert, and if an expert is required to issue a written report, such report must contain, among other things: "(i) a complete statement of all opinions the witness will express and the basis and reasons for them; [and] (ii) the facts or data considered by the witness in forming them . . . ."  Fed. R. Civ. P. 26(a)(2)(B). A party must make the expert disclosures "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). A party must also supplement its expert disclosures when required under Rule 26(e). Fed. R. Civ. P. 26(a)(2)(E).

"Rule 26(e) imposes a duty on the producing party to supplement information that is incorrect or incomplete." *Allgood v. Gen. Motors Corp.*, No. 1:02-cv-1077-DFH-TAB, 2007 WL 647496, at *3 (S.D. Ind. Feb. 2, 2007). Rule 26(e), however, "does not give the producing party a license to disregard discovery deadlines and to offer new opinions under the guise of the 'supplement' label." *Id.* (collecting cases); *see Stuhlmacher v. Home Depot USA, Inc.*, No. 2:10 cv 467, 2012 WL 5866297, at *3 (N.D. Ind. Nov. 19, 2012) ("[C]ommon sense suggests (and numerous decisions confirm) that an expert report that discloses new opinions is in no way a mere supplement to a prior report." (collecting cases)). Rule 26(e) "does not give license to sandbag one's opponent with claims and issues which should have been included in the expert witness' report . . . ." *Allgood*, 2007 WL 647496, at *3 (citation omitted) (striking the plaintiff's expert report where it went beyond rebutting the defendant's response and presented "entirely

11

new expert evidence"); *see also Sonrai Sys., LLC v. Romano*, No. 16 CV 3371, 2022 WL 4646323, at *7 (N.D. Ill. Sept. 30, 2022).

Indeed, "the purpose of supplementary disclosures is just that-to supplement." *In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. 154, 159 (S.D. Ind. 2009) (citation and brackets omitted). "Although the Federal Rules of Civil Procedure do not define what constitutes a supplemental report . . . , by its nature, a supplemental expert report necessarily contains information that was not expressed in the original report, or there would be no need to supplement." *Sonrai Sys., LLC*, 2022 WL 4646323, at *7 (citations, brackets, and quotation marks omitted). Generally,

> [a] revised expert report that is consistent with the core opinions expressed in the original expert report is likely to qualify as a supplemental report. Depending on the facts of the case, a revised expert report that utilizes an additional method of analysis and offers additional conclusions that were not part of the original report may also constitute a supplemental report. However the line between supplemental opinions and new opinions is not always clear and the determination of how to distinguish between the two likely depends on the facts of the case.

*Braun Corp. v. Vantage Mobility Int'l, LLC*, No. 2:06-CV-50-JVB-PRC, 2010 WL 2039596, at *3 (N.D. Ind. May 20, 2010) (citation and quotation marks omitted); *see Lexington Ins. Co. v. Horace Mann Ins. Co.*, No. 11 C 2352, 2015 WL 5174159, at *9 (N.D. Ill. Aug. 27, 2014) (explaining that a supplemental report is proper where "an expert's initial calculations were based on rough data and more current data ha[s] become available after the report was submitted" (citation omitted)).

If a party fails to provide the expert identifications and disclosures in accordance with Rule 26(a) and (e), exclusion of the non-disclosed evidence is automatic and mandatory, unless the non-disclosure was substantially justified or is harmless. Fed. R. Civ. P. 37(c)(1); *see David*

*v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003); *Stuhlmacher*, 2012 WL 5866297, at *2. In

determining whether an untimely disclosure is harmless, a court considers the following factors:

"(1) the prejudice or surprise to the party against whom the evidence is offered; (2) the ability of

the party to cure the prejudice; (3) the likelihood of disruption to the trial; and (4) the bad faith or

willfulness involved in not disclosing the evidence at an earlier date." *David*, 324 F.3d at 857

(citations omitted); *see also Meinert v. Praxair, Inc.*, No. 2:12-cv-92, 2016 WL 6947023, at *3

(N.D. Ind. Nov. 28, 2016).

*B. Analysis*

At the outset, WellPet observes that Cal's Preliminary Report consists of less than six

pages of text, while the Declaration is eight pages long and contains thirty-six substantive

paragraphs. (ECF 38 at 2). WellPet contends that the Declaration should be stricken because it

"contains a variety of new information, improper advocacy, and opinions that were not disclosed

in Cal's [Preliminary Report]," and because it offers legal conclusions. (*Id.* at 2-3). As WellPet

sees it, the Declaration "is equivalent to a supplemental expert report, and as such, violates this

Court's Scheduling Order, which required [Brown] to disclose all expert opinions by April 29,

2022." (*Id.* at 3). WellPet asserts that if the Declaration is allowed to stand, WellPet will suffer

significant prejudice because Phase I discovery is closed, the motion for class certification is

pending, and WellPet has no ability to cross-examine Cal about his new opinions or rebut them

with its own expert. (*Id.*).

1. New Information and Opinions

While WellPet asserts that the Declaration "contains a variety of new information . . . and

opinions" not in Cal's Preliminary Report, WellPet provides just two examples of such

13

purportedly new opinions. (*Id.* at 2). First, WellPet contends that Cal claims "for the first time" in the Declaration that:

> various additional sources of data are available to him to perform an AERMOD analysis, including "publicly available emission factors . . . [that] may be published by the U.S. EPA, state environmental agencies, universities, state agricultural extensions, and technical journals, in addition to [WellPet's] own records of its emissions data, equipment, processes, and production."

(ECF 38 at 2 (first and second alterations in original) (quoting ECF 35-4 ¶ 31)).

In that regard, Cal wrote in his Preliminary Report: "All atmospheric dispersion models, including, *AERMOD*, require real-world input data. Much of the data is available from publicly available sources. Sometimes on-site measurements must occur." (ECF 31-2 at 9). Cal then reached the following opinion: "Atmospheric dispersion of odorous compounds from the facility can be modeled using data obtained from publicly available sources, estimated or measured air emissions, local meteorological data and terrain data." (*Id.* at 3, 13). In his Declaration, Cal stated:

> If retained, I can perform a search for publicly available emission factors to be used in a future dispersion model. Acceptable emission factors may be published by the U.S. EPA, state environmental agencies, universities, state agricultural extensions, and technical journals, in addition to Defendant's own records of its emissions data, equipment, processes, and production. If acceptable emission factors are not available, a firm could be retained to measure emission factors for odorous species from Defendant's Facility.

(ECF 35-4 ¶ 31).

"While Rule 26 demands that expert disclosures be 'complete,' there is no requirement that such disclosures cover any and every objection or criticism of which an opposing party might conceivably complain. In other words, an expert need not stand mute in response to an opposing party's *Daubert* motion." *Allgood v. Gen. Motors Corp.*, No. 102CV1077DFHTAB,

2006 WL 2669337, at *5 (S.D. Ind. Sept. 18, 2006). Here, the foregoing paragraph in the Declaration responds to the *Daubert* criticisms raised by WellPet in its motion to exclude Cal's opinions and testimony. (ECF 30, 31). As such, it does not constitute a new opinion. *See Allgood*, 2006 WL 2669337, at *5 ("The supplemental declarations of plaintiffs' experts were lengthy but either responded to [the defendant's] specific *Daubert* criticisms or harmlessly repeat information provided in the earlier reports. The later submissions do not amount to the sort of prohibited ambush by an expert." (citation omitted)).

WellPet also seizes upon Cal's statement in the Declaration that "[a] lack of preexisting data is not altogether uncommon" and that "it is a generally accepted practice . . . to obtain relevant measurements to garner data necessary to run an atmospheric dispersion model." (ECF 38 at 2-3 (quoting ECF 35-4 ¶ 32)). WellPet claims this, too, is a new opinion in the Declaration that was not in the Preliminary Opinion. As already stated, Cal wrote in his Preliminary Report: "All atmospheric dispersion models, including *AERMOD*, require real-world input data. Much of the data is available from publicly available sources. Sometimes on-site measurements must occur." (ECF 31-2 at 9). Relatedly, in his Declaration, Cal stated:

> A lack of preexisting data is not altogether uncommon for some industries, and it is a generally accepted practice in this field to obtain relevant measurements to garner data necessary to run an atmospheric dispersion model. Measurements could be taken from stacks, fugitive sources (loading areas, storage piles), and volume or line sources (conveyors, delivery roads, etc.).

(ECF 35-4 ¶ 32). Again, this paragraph in the Declaration is responsive to the *Daubert* challenges raised by WellPet in its motion to exclude Cal. Both documents address that on-site measurements to garner data are often required to run the *AERMOD* model, and thus, the Declaration does not ambush WellPet. Consequently, I see no basis to strike this paragraph.

15

Given that WellPet points to no other purportedly new opinions in the Declaration, *see generally Damon v. Grand Trunk W. R.R., Inc.*, No. 2:05-CV-60, 2006 WL 2699736, at \*5 (N.D. Ind. Sept. 19, 2006) ("[C]ourts need not and indeed should not expend limited judicial resources in researching, refining, and otherwise fleshing out arguments that the parties themselves do not adequately support." (citation omitted)), I will move on to WellPet's second proffered basis to strike the Declaration.

2. <u>Legal Conclusions</u>.

WellPet also argues that the Declaration should be stricken because it improperly contains "various legal conclusions and commentary throughout . . . ." (ECF 38 at 3). Indeed, "[a]s a general rule, . . . an expert may not offer legal opinions." *Jimenez v. City of Chi.*, 732 F.3d 710, 721 (7th Cir. 2013); *see Pfeil v. Rogers*, 757 F.2d 850, 862 (7th Cir. 1985) ("Because legal argumentation is an expression of legal opinion and is not a recitation of a 'fact' to which an affiant is competent to testify, legal argument in an affidavit may be disregarded." (citation omitted)).

WellPet first points to paragraph 9 in the Declaration, in which Cal states:

> While I am not an attorney and do not purport to offer any legal opinions, it is my understanding that atmospheric dispersion modeling is not necessary during the class certification stage as it would be used to support and establish [WellPet's] liability that it was in fact responsible for the odors emitted onto Class [m]embers' properties and to support and establish to what level any odorous emission may be when they reach those properties.

(ECF 35-4 ¶ 9). In making this statement, Cal is making a legal conclusion on the question of whether or not atmospheric dispersion modeling is necessary during the class certification phase. As such, this paragraph improperly attempts to speak to an ultimate question of law. *See Grove US LLC v. Sany Am. Inc.*, Nos. 13-C-677, 15-C-647, 2019 WL 969814, at \*6 (E.D. Wis. Feb. 28,

16

2019) ("Although [the defendant] maintains that [the expert] is simply explaining his understanding of the applicable law which serves as the legal framework for his expert analyses and economic opinions, this opinion is offered on an ultimate question of law . . . ."). Consequently, this second sentence of paragraph 9 in the Declaration should be stricken.

Paragraph 10 of the Declaration is similarly problematic. The paragraph reads: "My belief that a full AERMOD study is not necessary is supported by the fact that I frequently provide a similarly-styled report during the class certification stage of the case as I did in this case." (ECF 35-4 ¶ 10). The first portion of this sentence should be stricken for the same reason expressed as to paragraph 9, so that paragraph 10 reads in its entirety: "I frequently provide a similarly-styled report during the class certification stage of the case as I did in this case." (*Id.*).

Certain language in paragraphs 24 and 35 also offer impermissible legal opinions.

Paragraph 24 states:

> Regarding my report in this case, while AERMOD cannot tell you precisely which individuals subjectively experienced an odor, or how it subjectively affects the use of their property, it can reliably determine what geographic areas were impacted by odorous emissions, and provide an objective quantification of the concentration of those odorous emissions in specific locations across a geographic area. *Accordingly, I believe that AERMOD offers a common basis for establishing Defendant's liability if I am asked to produce a final report in this case.*

(ECF 35-4 ¶ 24 (emphasis added)). Similarly, paragraph 35 states:

> If asked to do so at the liability stage of this case, I believe that I can procure all necessary data to produce a relevant and reliable atmospheric dispersion modeling study regarding the impacts of odor emissions from Defendant's Facility on and around the class area *and that such a model will provide a common class-wide basis for determining whether or not Defendant is liable for the emissions alleged in Plaintiff['s] complaint.*

(*Id.* ¶ 35 (emphasis added)). The last portion of both of these paragraphs is "couched in legal terminology," *Superior Aluminum Alloys, LLC v. U.S. Fire Ins. Co.*, No. 1:05-CV-207, 2007 WL

1850858, at *10 (N.D. Ind. June 25, 2007), and impermissibly speaks to "legal issues that will determine the outcome of [class certification and the] case," *Roundy's Inc. v. N.L.R.B.*, 674 F.3d 638, 648 (7th Cir. 2012) (citations and quotation marks omitted). Whether WellPet is liable or not is a matter for the jury to decide. *See id.* ("[Federal] Rules [of Evidence] 702 and 704 prohibit experts from offering opinions about legal issues that will determine the outcome of a case." (citations and quotation marks omitted)).

Accordingly, WellPet's motion to strike the Declaration should be GRANTED IN PART in that the Declaration contains impermissible legal conclusions in the second sentence of paragraph 9, the first portion of paragraph 10, the last sentence of paragraph 24, and the last portion of paragraph 35, which should all be STRICKEN. However, because the Declaration does not contain new opinions when compared to the Preliminary Report, the motion to strike should OTHERWISE BE DENIED.[4]

## IV. WELLPET'S MOTION TO EXCLUDE BROWN'S EXPERT, MARK P. CAL

WellPet seeks to exclude the opinions and testimony of Brown's expert, Cal, contending they are not a product of reliable methodology. For the following reasons, WellPet's motion to exclude is unpersuasive.

### A. Cal's Background and Preliminary Report

Cal is employed at New Mexico State University as a Professor of Civil and Environmental Engineering, and provides occasional consulting and expert services in the fields of civil and environmental engineering. (ECF 31-2 at 17-18; ECF 31-3 at 10-11). Most of his

---

[4] To the extent WellPet claims it was prejudiced because it filed the motion for class certification before Brown filed the Declaration (ECF 38 at 3), that argument is moot given my conclusion *infra* that the motion for class certification should be denied. WellPet can be afforded time to conduct additional discovery about Cal's opinions in the Declaration before Brown files a second motion for class certification, should WellPet choose to do so.

expert witness work has been done on behalf of plaintiffs in other cases brought by Brown's counsel. (ECF 31-3 at 8).

Cal was retained by Brown's counsel "to investigate the appropriateness of using atmospheric dispersion modeling, and more specifically, *AERMOD*, to analyze the impacts of nuisance level odors on the community near [the Facility]." (ECF 31-2 at 3). Cal emphasizes that he was not retained to perform any actual modeling in this case. (ECF 31-3 at 12, 23, 26, 31). The five opinions and conclusions Cal reached in the Preliminary Report (ECF 31-2 at 3, 13) are set forth in full *supra* and will not be repeated here.

Cal's Preliminary Report focuses on the AERMOD atmospheric dispersion modeling program developed by the American Meteorological Society and the U.S. Environmental Protection Agency and attaches three graphical figures. (*Id.* at 6, 7, 11, 12). Figure 1 is described as "a graphical representation of odor complaints communicated to plaintiff's counsel within a 1-mile radius of the facility." (ECF 31-2 at 5-6; *see* ECF 31-3 at 24). Figures 2 and 3 are examples of AERMOD output displaying odor concentration and frequency contours, respectively, created for a city not associated with this case. (ECF 31-2 at 11-12; ECF 31-3 at 23).

At his deposition, Cal described his Preliminary Report as "a little bit more general than" a "roadmap" as to "how AERMOD works." (ECF 31-3 at 12). Cal testified that Brown's counsel supplied the map labeled as Figure 1, and he incorporated the map into his Preliminary Report based on his understanding from previous cases with the same law firm that the map reflected residences where nuisance level odor were reported. (*Id.* at 14, 16, 18, 24). He observed that the residences were all within one mile of the Facility. (*Id.* at 14). Cal concedes that he "know[s] nothing" about the Facility or potential other odor sources in its vicinity. (*Id.* at 29; *see also id.* at

19

22). He explains that because he was not asked to do any modeling specific to this case, he included Figures 2 and 3 (depicting Peabody, Massachusetts) as examples from a previous case he had worked on with the same law firm. (*Id.* at 23, 25, 30-31). The only document Cal reviewed specific to this case is the complaint. (ECF 31-2 at 13; ECF 31-3 at 13, 33-34).

*B. Applicable Law*

The admissibility of expert evidence is governed by Federal Rule of Evidence 702, *Daubert*, 509 U.S. 579, and its progeny. *See Winters v. Fru-Con Inc*., 498 F.3d 734, 741 (7th Cir. 2007); *Green v. Horseshoe Hammond, LLC*, No. 2:18-CV-378-JEM, 2021 WL 2821170, at *1 (N.D. Ind. July 7, 2021). Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)  the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

*Daubert* requires a district court to exercise a "gatekeeping" function to ensure that expert testimony is both reliable and relevant pursuant to Rule 702. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 152 (1999); *Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004); *Design Basics, LLC v. Heller & Sons, Inc*., No. 1:16-CV-175-HAB, 2019 WL 2602861, at *5 (N.D. Ind. June 24, 2019). The fundamental purpose of the gatekeeping requirement "is to make certain that an expert, whether basing testimony upon professional studies or personal

20

experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152. To gauge reliability, "the court is to determine whether the expert is qualified in the relevant field and to examine the methodology the expert has used in reaching his conclusions." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) (citing *Kumho Tire Co.*, 526 U.S. at 153). "[An expert's] work is admissible only to the extent it is reasoned, uses the methods of the discipline, and is founded on data." *Lang v. Kohl's Food Stores, Inc.*, 217 F.3d 919, 924 (7th Cir. 2000).

"District courts apply the *Daubert* framework using a three-part analysis." *Design Basics, LLC*, 2019 WL 2602861, at *6 (citing *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010)). The court "must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Myers*, 619 F.3d at 644 (citation and quotation marks omitted). The district court is given "wide latitude in performing its gatekeeping function and determining both how to measure the reliability of expert testimony and whether the testimony itself is reliable." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 810 (7th Cir. 2012) (citation omitted).

If the proposed expert testimony satisfies the *Daubert* threshold of both relevance and reliability, "the accuracy of the actual evidence is to be tested before the jury with the familiar tools of 'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Id.* at 805 (quoting *Daubert*, 509 U.S. at 596); *see Design Basics, LLC*, 2019 WL 2602861, at *6 ("Although the court must decide questions of admissibility, the weight and credibility to be accorded expert testimony is properly left to the jury." (citation omitted)).

"The burden of showing an expert's testimony to be relevant and reliable is with the proponent of the evidence." *Bickel v. Pfizer, Inc.*, 431 F. Supp. 2d 918, 921 (N.D. Ind. 2006) (citation omitted).

"[W]hen an expert's report or testimony is critical to class certification . . . a district court must conclusively rule on any challenge to the expert's qualifications or submission prior to ruling on a class certification motion." *Koehler v. Infosys Techs. Ltd. Inc.*, No. 13-cv-885-pp, 2022 WL 4234946, at *27 (E.D. Wis. Sept 14, 2022) (second alteration in original) (quoting *Am. Honda Motor Co. v. Allen*, 600 F.3d 813, 815-16 (7th Cir. 2010)); *see also Morr v. Plains All Am. Pipeline, L.P.*, No. 17-cv-163-SMY, 2021 WL 4478660, at *2 (S.D. Ill. Sept. 30, 2021). That is, "[t]he court must . . . resolve any challenge to the reliability of information provided by an expert if that information is relevant to establishing any of the Rule 23 requirements for class certification." *Koehler*, 2022 WL 4234946, at *27 (second alteration in original) (quoting *Am. Honda Motor Co.*, 600 F.3d at 816). "If a district court has doubts about whether an expert's opinions may be critical for a class certification decision, the court should make an explicit *Daubert* ruling." *Id.* (quoting *Messner v. Northshore Univ. HealthSystem*, 669 F.3d 802, 812 (7th Cir. 2012)).

*C. Analysis*

WellPet does not challenge Cal's qualifications to serve as an expert, so the first part of the three-part *Daubert* inquiry is not in question. Rather, WellPet argues that Cal's opinions are not a product of reliable methodology. Specifically, WellPet argues that Brown's motion for class certification relies heavily on Cal's opinions and testimony, but Cal has not done any actual analysis or investigation specific to the Facility or WellPet, rendering his opinions unreliable.

(ECF 31 at 5). WellPet contends that Cal's Preliminary Report "merely parrots complaint allegations and information prepared by [Brown's] counsel under the guise of expert testimony," and features aerial analysis of atmospheric odors in a city unrelated to this dispute. (*Id.*).

WellPet points out that the Preliminary Report "is nearly identical to reports Cal submitted for [Brown's] law firm in various other putative class action nuisance cases across the country, all with the same promise that more analysis *could* be done to substantiate the plaintiffs' claims, if only the Court certifies the class first." (*Id.*). Cal admits that the only document he reviewed specific to this case was the complaint, and that he does not know what the modeling would actually show when applied to the Facility and the City of Mishawaka. (ECF 31-3 at 31, 33-34). As such, WellPet contends Cal's opinions and testimony do not meet the bare minimum requirements of Rule 702 and *Daubert* because he "has not relied on sufficient site-specific facts, he has not applied any methodology, let alone a reliable one, and his opinions are not helpful for determining class certification." (ECF 31 at 5).

In response, Brown asserts that WellPet's motion "completely ignores the procedural posture of this case and the parties' agreement to bifurcate discovery." (ECF 35 at 1). He argues that WellPet is attempting to "manufacture an incorrect admissibility standard on class certification experts to prove liability questions at the class certification stage." (*Id.* at 2). He further contends, though he cites just two state-court cases in support, that "[c]ourts in multiple jurisdictions have certified classes based on similar records and similar preliminary expert reports from . . . Cal, which involved no modeling of the defendants's emissions." *Id.* (citing *Sutton v. Apex Env't, LLC*, No. 20-cv-116 (Ohio Ct. Comm. Pleas, Jefferson Cnty. Sept. 23, 2022); *Gonzales v. Clark-Floyd Landfill, LLC*, No. 10C02-1608-CT-131 (Ind. Clark Cnty. Cir.

Ct. Oct. 18, 2019)). As Brown sees it, Cal's lack of analysis of WellPet's liability at the class certification stage "goes merely to the weight, not to the admissibility, of [Cal's] testimony." (*Id.*).

Having considered the parties' arguments, I find it pivotal that Cal's opinions speak only to the appropriateness of using AERMOD methodology *in the future* to analyze the impact of nuisance level odors in this case. It is undisputed that Cal has not yet done so, and he further admits that he has no idea what the outcome of any site-specific modeling will show. (ECF 31-3 at 31). Consequently, it is apparent as a threshold matter that Cal's opinions are likely of limited worth to the motion for class certification, given that he has performed no site-specific analysis to date. *See Thornburg v. Ford Motor Co.*, No. 4:19-cv-01025-NKL, 2022 WL 4348475, at *5 (W.D. Mo. Sept. 19, 2022) (denying motion for class certification where Cal's expert report "states only that his model *can* show which properties may have been impacted," but he had not yet performed any analysis); *Hamilton v. 3D Idapro Sols., LLC*, No. 18-cv-54-jdp, 2019 WL 9089916, at *3 (W.D. Wis. Aug. 1, 2019) (denying motion for class certification where Cal's expert report "says only that AERMOD would be capable of modeling odors within and around the class area[,] . . . [but] makes no opinion about what those simulations will show or whether [the defendant's] emissions will correlate, even roughly, with the proposed class area" (internal citation omitted)).

But the issue at hand in the motion to exclude is whether Cal's opinions about the appropriateness of using AERMOD in this case are sufficiently reliable to be admissible, not how much weight should be applied if so. To that end, WellPet claims that Cal's opinions must be excluded as unreliable because he has not performed an independent study or review of the

facts of the case, he does not have the data necessary for his proposed modeling, and he has not accounted for other possible odor sources in the Class area. (ECF 31 at 12).

WellPet's criticisms at this stage seem premature. Cal is only opining that he *can* use AERMOD methodology after he reviews the facts of the case, that he *can* obtain the data necessary for the AERMOD modeling, and that AERMOD *can* account for other possible odor sources. That is, his Preliminary Report contains "general" information as to how AERMOD works and "how it can be applied to nuisance level odors." (ECF 31-3 at 12). He makes clear that the only document he has reviewed specific to this case is the complaint. (ECF 31-2 at 14). As Brown suggests, "this Court can consider Dr. Cal's opinions for what they are worth." (ECF 35 at 2); *see Suchanek v. Sturm Foods, Inc.*, 311 F.R.D. 239, 249 (S.D. Ill. 2015) ("Roese's report is not unreliable or irrelevant under *Daubert*, it just doesn't help Defendants[] accomplish anything with respect to class certification. But that does not mean that his report must be excluded and stricken from the record. The Court simply chooses to afford it little to no weight on the matters relevant to class certification."); *see also Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 768 (7th Cir. 2013) ("The fact that an expert's testimony contains some vulnerable assumptions does not make the testimony irrelevant or inadmissible.").

Consequently, WellPet's motion to exclude Cal's opinions and testimony should be DENIED. WellPet's criticisms of Cal's Preliminary Report and Declaration will be taken into account by applying little, if any, weight to Cal's opinions when analyzing the motion for class certification.

## V. BROWN'S MOTION TO EXCLUDE WELLPET'S EXPERT, TONY SCHROEDER

Brown, in turn, seeks to exclude the opinions and testimony of Tony Schroeder,

WellPet's expert. (ECF 40). Brown does not contest Schroeder's qualifications as an expert. Rather, Brown argues that Schroeder improperly speculates on the credibility of the conclusions reached by Cal in his Preliminary Report, and that Schroeder's opinions are "not based on any special skill, knowledge, or experience." (ECF 41 at 12).

### A. Schroeder's Background and Rebuttal Report

Schroeder is a Principal Consultant for Trinity Consultants, Inc., an international environmental health and safety consulting firm. (ECF 31-6 at 2, 5, 14-15). He is credentialed as a Certified Consulting Meteorologist through the American Meteorological Society and a Qualified Environmental Professional through the Board of Global EHS Credentialing. (*Id.* at 5, 14). He has used the AERMOD methodology since 2003. (*Id.* at 5).

Schroeder was engaged as a rebuttal expert by WellPet to review and comment on Cal's Preliminary Report. (*Id.* at 4). In preparation, Schroeder reviewed the Preliminary Report, the complaint, the Data Sheets, several publications, and the odor citations from the City of Mishawaka. (*Id.* at 18). He obtained and reviewed meteorological data from the Mishawaka area (*id.* at 10, 18) and visited the WellPet Facility (ECF 27-9 at 13). Additionally, his firm conducted a wind rose analysis. (ECF 31-6 at 10-12). Schroeder issued his Rebuttal Report on June 29, 2022. (*Id.* at 2).

In the Rebuttal Report, Schroeder criticized Cal's Preliminary Report on the following bases: (1) that Cal did not perform any modeling to show that residents located within a one-mile radius are similarly impacted, or even impacted at all, by odors from the Facility; (2) that Cal indicated air modeling "can determine the frequency, intensity, and location of nuisance level odors within the proposed class area," but did not specify which data should be used to do so; (3)

that Figures 2 and 3 of the Preliminary Report do not represent modeling of the Facility or the

Mishawaka area; and (4) a wind rose analysis conducted by Schroeder's firm shows that "wind

does not blow in all directions with equal frequency in the area," and thus a proposed class area

that is circular in shape does not properly account for those variations. (*Id.* at 4, 12).

### B. Applicable Law

"Under Rule 26, rebuttal [expert] reports are limited to 'the same subject matter'

identified in the other party's expert report." *Ernst v. City of Chi.*, No. 08 C 4370, 2013 WL

4804837, at *1 (N.D. Ill. Sept. 9, 2013) (quoting Fed. R. Civ. P. 26(a)(2)(D)(ii)). "The proper

function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence

offered by an adverse party." *Gravitt v. Mentor Worldwide LLC*, 342 F.R.D. 130, 134-35 (N.D.

Ill. 2022) (quoting *United States v. Grintjes*, 237 F.3d 876, 879 (7th Cir. 2001)); *see Allen v. Am.

Cyanamid*, Nos. 11-CV-0055, 14-CV-1423, 2021 WL 1086245, at *9 (E.D. Wis. Mar. 22, 2021)

("Dr. Swider's rebuttal reports are directed entirely at the credibility of the defendants' experts'

conclusions. Essentially, his opinions are giving the jury reasons to perhaps be skeptical of those

experts' results.").

That is, "[a]n expert may criticize the methods, calculations, and conclusions offered by

the opposing side's expert." *Bamcor LLC v. Jupiter Aluminum Corp.*, 767 F. Supp. 2d 959, 976

(N.D. Ind. 2011) (citation omitted). "Such criticisms aid the trier of fact in determining how

much weight to assign the expert's opinion in deliberation." *Id.* (citation omitted). "However,

experts are limited in what they can testify to and cannot attack the credibility of other experts."

*Id.* (citations omitted). "[T]he most useful thing for a jury or a judge . . . would be [for the

rebuttal expert] to address that [opposing] expert's points, either in sequence or by identifying

them and critiquing them." *Ernst*, 2013 WL 4804837, at *3.

*C. Analysis*

1. Credibility Argument

Brown seeks to exclude Schroeder's opinions and testimony on the grounds that "[t]he vast majority of Mr. Schroeder's testimony impermissibly opines on the credibility of Dr. Cal and his report." (ECF 41 at 4 (citation omitted)). More particularly, Brown contends that Schroeder's comment that Cal did not actually perform any modeling to prove the impact of the Facility odors improperly attacks Cal's credibility, as this comment does not actually address or rebut Cal's conclusion that AERMOD can analyze the impact of Facility odors on a class-wide basis. (*Id*. at 6). Brown further asserts that Schroeder's observation is an improper merits-based challenge, ignoring that this action was bifurcated between certification and merits and that Cal was not retained to perform any actual modeling. (*Id.*).

Having considered Brown's arguments, I am not persuaded that Schroeder's opinions and testimony should be excluded. By noting that Cal did not actually perform any modeling in support of his conclusion that AERMOD can be used to prove the impact of Facility odors, Schroeder simply points out what he views to be an "intrinsic weakness" in the Preliminary Report, which is permissible as a rebuttal expert. *U.S. Gypsum Co. v. Lafarge N. Am. Inc.*, 670 F. Supp. 2d 768, 776-77 (N.D. Ill. 2009) (permitting the rebuttal expert to opine on "what he views as intrinsic weaknesses in [the opposing expert's] reports").

Next, Brown contends that Schroeder improperly attacked Cal's credibility when challenging Cal's conclusion that air modeling "can determine the frequency, intensity, and location of nuisance level odors within the proposed class area." (ECF 41 at 6 (quoting ECF 27-8

28

at 3)). Specifically, Brown asserts that Schroeder erroneously commented that Cal did not specify in his Preliminary Report which data should be used to perform AERMOD. (*Id.* at 6-7). Brown emphasizes that Cal *did* identify in the Preliminary Report specific data and where it can be obtained, and that Schroeder testified during his deposition that he had no reason to doubt that such data is available. (*Id.* at 7; ECF 27-9 at 31; ECF 31-2 at 9).

It is true that Cal did identify in the Preliminary Report certain data necessary for modeling and where it can be obtained—that is, he specifically mentioned meteorological data available from public sources, terrain data available from WebGIS website, and source emissions from on-site testing. (ECF 31-2 at 9). But Schroeder does not dispute Cal's mention of meteorological or terrain data. Rather, he specifically criticizes Cal's mention of emission factors from on-site testing by noting that Cal did not do any on-site testing, and stating:

> [Cal] provides no evidence that general emission factors are available. While there may be emission factors for common odorous compounds, emission factors for complex, non-homogeneous mixtures of odorous compounds are often not available. On-site testing can be conducted to determine a site-specific emission rate; however, the [Facility] produces numerous different products/recipes. As emissions may vary depending on the product being produced, as well as production and airflow rates, it is not practicable to test all possible operating scenarios.

(ECF 27-8 at 7).

Thus, in writing this paragraph Schroeder is directly disputing, at least in part, Cal's opinion that "[e]missions can be determined by on-site testing or estimated with emission factors." (ECF 31-2 at 9). In doing so, Schroeder is expressing a contrary opinion, based on his own knowledge and experience, about the availability of certain emission factors via on-site testing, and he is identifying potential weaknesses with on-site testing of emission factors at facilities producing multiple product lines. Schroeder's pointing out these "purported flaws in

[Cal's] analysis" is consistent with the function of a rebuttal expert. *CellTrust Corp v. ionLake, LLC*, No. 19-cv-2855 (WMW/TNL), 2022 WL 4018042, at *29 (D. Minn. Sept. 2, 2022) (denying a motion to exclude a rebuttal expert were the rebuttal expert was "rebutting [the opposing expert's] opinions by applying his knowledge and experience to identify purported flaws in [the opposing expert's] analysis").

Brown also argues that Schroeder improperly attacked Cal's credibility by noting that Figures 2 and 3 in the Preliminary Report reveal AERMOD output for a city unrelated to this case. (ECF 41 at 7; *see* ECF 31-2 at 11-12). Brown contends that Schroeder's criticism on this basis is unfair given that Cal specifically indicated in the Preliminary Report that Figures 2 and 3 were "examples" of AERMOD output. (*Id.*). But Brown's argument in support of barring Schroeder's opinions falls short. Schroeder accurately states that Cal's "AERMOD outputs shown in Figures 2 and 3 of his report do not represent modeling of the area surrounding the [Facility] and appear to show modeling conducted of an area in Massachusetts unrelated to this case." (ECF 27-8 at 3). Schroeder then concludes that Figures 2 and 3 "simply show typical contour plots generated using AERMOD output concentrations with no bearing on the proposed class in Mishawaka." (*Id.*). Again, Schroeder is permissibly highlighting an "intrinsic weakness" in Cal's Preliminary Report. *U.S. Gypsum Co.*, 670 F. Supp. 2d at 776-77; *see Aviva Sports, Inc. v. Fingerhut Direct Mktg., Inc*., 829 F. Supp. 2d 802, 834 (D. Minn. 2011) ("It is the proper role of rebuttal experts to critique plaintiffs' expert's methodologies and point out potential flaws in the plaintiff's experts' reports.").

Relatedly, Brown argues that Schroeder cannot "have [his] cake and eat it too" by concluding Figures 2 and 3 have "no bearing in the proposed class in Mishawaka," and then

using Figures 2 and 3 to conclude that residents located within a one mile radius of the Facility

would not be similarly impacted. (ECF 41 at 7). Specifically, Schroeder opined:

> [Figures 2 and 3] show that it is common to see varying modeled concentrations
> both in terms of direction and distance from a facility, with concentrations
> generally decreasing with distance from a source. [Figures 2 and 3] confirm that
> all locations within a 1 mile radius of an emissions source would not be expected
> to be similarly impacted.

(ECF 27-8 at 3). Brown claims this is "an illogical and frivolous argument on credibility." (ECF

41 at 7). Not so. Schroeder's observations about the varying modeling concentrations exhibited

in Figures 2 and 3 are a fair rebuttal to Cal's use of a proposed class of residents located within a

one-mile radius of the Facility. *See In re Ready-Mixed Concrete Antitrust Litig.*, 261 F.R.D. at

159 ("[A rebuttal expert report] does exactly what it says: it rebuts, in the form of a complete

statement of all of the opinions expressed by the author, the report of the opposing party's

expert." (citations omitted)).

More generally, Brown argues that the headings and subheadings used in Schroeder's

Rebuttal Report— "Review of Dr. Cal Report," "Comment on Section [X] of Dr. Cal's Report,"

and "Comment on Conclusion [X] of Dr. Cal's Report"—are further evidence that the Rebuttal

Report is an improper attack on Cal's credibility. (ECF 41 at 8 ("Mr. Schroeder does not

reference Dr. Cal to provide context for alternative conclusions; he mentions Dr. Cal solely to

attack his credibility.")). This argument, too, is unpersuasive. As already explained, "the most

useful thing for a jury or a judge . . . would be [for the rebuttal expert] to address that [opposing]

expert's points, either in sequence or by identifying them and critiquing them." *Ernst*, 2013 WL

4804837, at *3. That is what Schroeder does here, organizing his Rebuttal Report in a manner

that responds to the points Cal made in his Preliminary Report. Contrary to Brown's assertion,

Schroeder stayed within his lane and did not improperly attack Cal's credibility. *Cf. Unknown Party v. Ariz. Bd. of Regents*, No. CV-18-01623-PHX-DWL, 2022 WL 4481519, at *17 (D. Ariz. Sept. 27, 2022) (finding that the expert "exceeds the permissible scope of expert testimony when he asserts that Nannetti is personally biased toward Doe or in favor of respondents in general"); *Harris v. City of Chi.*, No. 14 C 4391, 2017 WL 3334957, at *4 (N.D. Ill. Aug. 2, 2017) (barring a rebuttal expert's report as an improper credibility attack where the rebuttal expert concluded the opposing expert "simply lied," was "so inexperienced in the assessment of field data that a valid assessment was not possible," and "never looked at Plaintiff's examination and the physiological tracings").

Finally, Brown contends it is a red flag that Schroeder does not offer any alternative conclusion of his own in the Rebuttal Report. (ECF 41 at 8 ("Schroeder does not reference Dr. Cal to provide context for alternative conclusions; he mentions Dr. Cal solely to attack his credibility.")). Not necessarily so. A rebuttal expert witness may criticize a plaintiff's expert's theories "without offering alternatives." *1st Source Bank v. First Res. Fed. Credit Union*, 167 F.R.D. 61, 65 (N.D. Ind. 1996); *see also Aviva Sports, Inc.*, 829 F. Supp. 2d at 834-35 (collecting cases). Therefore, for all of the foregoing reasons, Brown's various arguments in support of his first proffered basis to exclude Schroeder's opinions and testimony—that they impermissibly opine on Cal's credibility—are unpersuasive.

2. Skill, Knowledge, or Experience Argument

Brown's second proffered grounds to exclude Schroeder's opinions and testimony is that they "are not based on any special skill, knowledge, or experience," and as such, are not helpful to decide class certification. (ECF 41 at 12 (citations and quotation marks omitted)). "An

expert's opinion is helpful only to the extent the expert draws on some special skill, knowledge, or experience to formulate that opinion . . . ." *Cage v. City of Chi.*, 979 F. Supp. 2d 787, 834 (N.D. Ill. 2013) (citation omitted). "An expert must testify to something more than what is obvious to the layperson in order to be of any particular assistance to the [factfinder]." *Hawn v. Speedway LLC*, No. 1:16-CV-359, 2018 WL 1896634, at *3 (N.D. Ind. Apr. 21, 2018) (quoting *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 871 (7th Cir. 2001)). "To be helpful, the opinion must aid the [factfinder] to decide an issue of consequence." *SCCI Hosps. of Am., LLC v. Home-Owners Ins. Co.*, 571 F. Supp. 3d 942, 948 (N.D. Ind. 2021).

Brown first argues that the Rebuttal Report merely "provides observations that are obvious to the layperson which in no way help the Court decide class certification." (ECF 41 at 12 (citation and internal quotation marks omitted)). To illustrate this point, Brown points to several observations Schroeder made in the Rebuttal Report, including: (1) that Cal did not conduct any actual modeling in this case; (2) that Figures 2 and 3 of Cal's Preliminary Report, which are examples of AERMOD output, have no bearing on the proposed class; and (3) that code compliance reports from the City of Mishawaka relating to the Facility indicate that the frequency of odor complaints has declined after the Facility installed an odor control system in 2016. (ECF 41 at 12-14). Brown contends that these observations by Schroeder are "not based on expertise as it is apparent to anyone who reads [the Preliminary Report] that [Cal] did not conduct modeling to prove the impact of Facility odors" (*id.* at 12), that he marked Figures 2 and 3 as "examples" of AERMOD output (*id.* at 13); and that "[n]o expertise is required to review odor complaints . . . ." (*id.* at 14).

Brown further argues that Schroeder effectively acknowledged that modeling could be

conducted using the type of data and sources Cal specified in his Preliminary Report, and thus, his observation that Cal failed to identify specific data is "incorrect" and "irrelevant." (*Id.* at 13). Overall, Brown argues that Schroeder makes "generic statements about Dr. Cal's conclusions, but . . . does not provide expert opinion[s] or conclusions of his own that assist the Court," and that "[t]he few comments that may constitute expert opinion . . . may be relevant in the merits phase, . . . [but] do not assist the Court in deciding class certification." (*Id.* at 14).

In response, WellPet asserts that the Rebuttal Report "clearly meets the standard for admissibility under Federal Rule of Evidence 702." (ECF 44 at 1). It emphasizes that in contrast to Cal, Schroeder actually visited the Facility and reviewed the Preliminary Report, the complaint in this case, the Data Sheets, odor citations from the city of Mishawaka, and meteorological data from the Mishawaka area. (*Id.* at 2 (citing ECF 27-9 at 22-23, 31, 63)). WellPet emphasizes that from this information, Schroeder formulated substantive critiques of the Preliminary Report, performed a wind rose analysis based on meteorological data, and issued the conclusions outlined in his Rebuttal Report. (*Id.*). As such, WellPet urges that the Rebuttal Report properly critiques Cal's opinions based on Schroeder's "qualification[s], experience, and analysis of facts relevant to this case." (*Id.* at 3).

Indeed, Schroeder has "twenty years of experience in air dispersion modeling and air quality management." (*Id.* at 8). "No one denies that an expert might draw a conclusion from a set of observations based on extensive specialized experience." *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 896 (7th Cir. 2011) (brackets omitted) (quoting *Kumho Tire Co.*, 526 U.S. at 156). While Brown may disagree with some of Schroeder's observations, the issues raised by Brown "go to the weight and/or credibility the Court should give [Schroeder's] opinions, not to

their admissibility." *Queen v. W.I.C., Inc*., No. 14-CV-519-DRH-SCW, 2017 WL 1191224, at *8 (S.D. Ill. Mar. 31, 2017). And while this case has been bifurcated between class certification and merits, the class certification issue may "entail some overlap with the merits of the plaintiff's underlying claim." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011); *see Bilek v. Fed. Ins. Co.*, No. 21 CV 1651, 2022 WL 18912277, at *3 (N.D. Ill. Dec. 12, 2022) ("[T]he distinctions between class discovery and merits discovery are not always obvious or easily discernable, and a consideration of the merits, to a certain extent, is inextricably intertwined with the Rule 23 requirements of commonality and typicality, so certification and class-wide merits discovery will likely overlap to some degree." (citation omitted)).

As a final matter, Brown argues that the wind rose analysis included in the Rebuttal Report is irrelevant and should be excluded. (ECF 41 at 14-15). Schroeder's wind rose analysis shows that "winds do not blow from all directions at the same frequency" and contributed to his conclusion that "a proposed class area that is circular in shape does not appropriately characterize locations with similar impacts." (*Id.* at 14 (quoting ECF 27-8 at 9-10)). Brown contends that the revised proposed Class area is no longer circular in shape but "is irregularly shaped based on information provided by Class [m]embers." (*Id.* at 14-15 (citing ECF 27 at 5)). He also notes that Schroeder acknowledged that factors other than wind affect the dispersion of odors, and that AERMOD can be used in circumstances where wind blows in different directions at different frequencies. (*Id.* at 15 (citing ECF 27-9 at 37-38)). As Brown sees it, Schroeder's testimony "has no bearing on Dr. Cal's conclusion that AERMOD can be used in this case to evaluate Facility emissions." (*Id.*). Brown asserts that in any event "[a] large portion of the Class [a]rea is northeast of the Facility, which is consistent with what the wind rose suggests," and

consequently, "if anything, [the wind rose analysis] corroborates the Class [a]rea that [he] proposes." (*Id.* (citing ECF 27-8 at 4; ECF 27 at 5)).

Again Brown's arguments go more to the weight of the evidence, not its admissibility. *See Queen*, 2017 WL 1191224, at *8. Contrary to Brown's assertion, Schroeder's wind rose analysis appears relevant to the class certification issue and whether Class members within the proposed Class area would be similarly impacted by the odors due to wind patterns. Therefore, Brown's arguments based on Schroeder's wind rose analysis are also not a basis to exclude his opinions and testimony. The Rebuttal Report is likely to be of assistance in determining the class certification issue, and thus, the motion to exclude Schroeder's opinions and testimony should be DENIED.

## VI. PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Having duly disposed of the parties' expert-related motions, I will now turn to Brown's motion for class certification. Based on the record presented, I conclude that the motion should be denied without prejudice.

### A. Applicable Law

"The purpose of class action litigation is to avoid repeated litigation of the same issue and to facilitate prosecution of claims that any one individual might not otherwise bring on [his] own." *Chi. Tchrs. Union, Loc. No. 1 v. Bd. of Educ. of City of Chi.*, 797 F.3d 426, 433 (7th Cir. 2015). "The district court's task . . . [is] to determine if the [plaintiffs] present[] a scenario in which judicial efficiency would be served by allowing their claims to proceed en masse through the medium of a class action rather than through individual litigation." *Id.* In making this determination, the district court's "analysis is not free-form, but rather has been carefully

36

scripted by the Federal Rules of Civil Procedure." *Id.* "The party seeking certification bears the burden of demonstrating that certification is proper by a preponderance of the evidence." *Id.* (citation omitted).

"Because a class action is an exception to the usual rule that only a named party before the court can have [his] claims adjudicated, the class representative must be part of the class and possess the same interest and suffer the same injury." *Id.* (citing *Dukes*, 564 U.S. at 348). "The general gate-keeping function of Federal Rule [of Civil Procedure] 23(a) ensures that they are." *Id.* All class actions must meet the following four explicit requirements of Rule 23(a):

> (1) the class is so numerous that joinder of all members is impracticable (numerosity);
>
> (2) there are questions of law or fact common to the class (commonality);
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality); and
>
> (4) the representative parties will fairly and adequately protect the interests of the class (adequacy of representation).

*Id.* (citing Fed. R. Civ. P. 23(a)).

In addition to satisfying the requirements of Rule 23(a), a class action must also meet one of the three alternatives in Rule 23(b). *Messner*, 669 F.3d at 811. When as here, a plaintiff seeks certification under Rule 23(b)(3), he "must also show: (1) that the questions of law or fact common to the members of the proposed class predominate over questions affecting only individual class members; and (2) that a class action is superior to other available methods of resolving the controversy." *Id.*

Further, "courts have long recognized an implicit requirement under Rule 23 that a class must be defined clearly and that membership be defined by objective criteria rather than by, for

example, a class member's state of mind." *Hizer v. Pulaski Cnty., Ind.*, No. 3:16-CV-885-JD-MGG, 2017 WL 3977004, at *4 (N.D. Ind. Sept. 11, 2017) (quoting *Mullins v. Direct Dig., LLC*, 795 F.3d 654, 657 (7th Cir. 2015)). "To apply this 'ascertainability standard,' the Court must ensure 'that the class definition satisfies the established meaning of ascertainability by defining classes early and with objective criteria.'" *Id.* (brackets omitted) (quoting *Mullins*, 795 F.3d at 672); *see Oshana v. Coca-Cola Co.*, 472 F.3d 506, 513 (7th Cir. 2006) (explaining that a plaintiff must show "that the class is indeed identifiable as a class").

"The ascertainability requirement does not mean that all members must be identifiable at the time of certification." *Hizer*, 2017 WL 3977004, at *4 (citation omitted). Rather, "[i]f the general outlines of the membership of the class are determinable at the outset of the litigation, a class will be deemed to exist." *Id.* (quoting 7A Wright & Miller, *Federal Practice & Procedure* § 1760 (3d ed.)). On the other hand, "[w]hen 'there is no way to know or readily ascertain who is a member of the class,' the class 'lacks the definiteness required for class certification.'" *Steimel v. Minott*, No. 1:13-cv-957-JMS-MJD, 2014 WL 1213390, at *1 (S.D. Ind. Mar. 24, 2014) (quoting *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 495 (7th Cir. 2012)).

"In conducting [the Rule 23] analysis, the court should not turn the class certification proceedings into a dress rehearsal for the trial on the merits." *Messner*, 669 F.3d at 811 (collecting cases). "On issues affecting class certification, however, a court may not simply assume the truth of the matters as asserted by the plaintiff." *Id.* "If there are material factual disputes, the court must receive evidence . . . and resolve the disputes before deciding whether to certify the class." *Id.* (alteration in original) (citation and quotation marks omitted). That is, "the district court is to perform a 'rigorous analysis' to determine that the prerequisites of Rule 23 are

38

satisfied when a class is to be certified because actual, not presumed, conformance with Rule 23(a) remains indispensable." *Hizer*, 2017 WL 3977004, at *2 (citing *Dukes*, 564 U.S. at 350-51). "Frequently, that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim, and this cannot be helped." *Id.* (citing *Dukes*, 564. U.S. at 350-51).

*B. Analysis*

1. <u>The Elements of Brown's Claims</u>

Brown seeks to bring state-law claims for private nuisance, public nuisance, and negligence on behalf of the class. (ECF 7). A plaintiff advancing a negligence claim under Indiana law must establish: "(1) a duty owed the plaintiff by the defendant, (2) a breach of the duty, and (3) an injury proximately caused by the breach of duty." *Walker v. City of E. Chi.*, No. 2:16 CV 367, 2017 WL 4340259, at *7 (N.D. Ind. Sept. 29, 2017) (quoting *Yost v. Wabash Coll.*, 3 N.E.3d 509, 515 (Ind. 2014)). Under Indiana law "[w]hatever is: (1) injurious to health; (2) indecent; (3) offensive to the senses; or (4) an obstruction to the free use of property; so as essentially to interfere with the comfortable enjoyment of life or property, is a nuisance, and the subject of an action." Ind. Code § 32-30-6-6.

 "Private nuisance arises when a party has used his property to the detriment of the use and enjoyment of another's property." *A.B. v. Wal-Mart Stores, Inc.*, No. 1:14-cv-00422-RLY-MJD, 2014 WL 4965514, at *3 (S.D. Ind. Oct. 3, 2014) (internal quotation marks omitted) (citing *Scheckel v. NLI, Inc.*, 953 N.E.2d 133, 138 (Ind. Ct. App. 2011)). "On the other hand, a public nuisance is 'caused by unreasonable interference with a common right.'" *City of Gary v. Shafer*, No. 2:07-CV-56-PRC, 2007 WL 3019918, at *3 (N.D. Ind. Oct. 4, 2007) (quoting *Ind. Limestone Co. v. Staggs*, 672 N.E.2d 1377, 1384 (Ind. Ct. App. 1996)). Further, "[a] nuisance is

classified as public if it affects an entire community or neighborhood or private if its effect is peculiar to an individual or a limited number of individuals." *Morris v. Arcelormittal USA, Inc.*, No. 2:09-CV-108 RM, 2010 WL 11680298, at *2 (N.D. Ind. Aug. 12, 2010) (quoting *Wendt v. Kerkhof*, 594 N.E.2d 795, 797 (Ind. Ct. App. 1992)).

    2. <u>Ascertainability of the Proposed Class</u>

Before turning to the Rule 23(a) and (b)(3) factors, the Court must assess whether the proposed class is ascertainable. That is, the Court must determine whether the proposed class is "'defined clearly' using 'objective criteria.'" *Hamilton*, 2019 WL 9089916, at *1 (quoting *Mullins*, 795 F.3d at 657).

Brown defined the proposed class in his complaint as: "All owners/occupants and renters of residential property within one mile (1.0) of the Facility property boundary." (ECF 7 ¶ 32 (bold emphasis omitted)). This definition was used by both experts when writing their respective reports. (*See* ECF 31-2 at 5-6; ECF 32-4 at 4). This initial one-mile radius appears overly broad, given that there was a large area to the south and west of the Facility from which counsel received no complaints of odors. (ECF 31-2 at 6); *see Burkhead v. Louisville Gas & Elec. Co.*, 250 F.R.D. 287, 292 (W.D. Ky. Mar. 21, 2008) ("Though Plaintiffs repeatedly describe the proposed class definition as 'objectively reasonable,' they offer no evidence whatsoever that the airborne contaminants might have spread in all directions from [the defendant's] facility for a distance of up to two miles."); *Hamilton*, 2019 WL 9089916, at *4 (finding the proposed 1.5-radius class definition based on counsel's surveys was overly broad where no AERMOD analysis had been done and there were several potential sources of odors in the area).

Apparently recognizing this potential flaw, Brown revised his proposed class definition

in his motion for class certification. (ECF 27 at 5; ECF 27-4 ¶ 5). Brown proposed the new Class

area with boundaries comprised of various streets, rather than based on a one-mile radius. (ECF

27 at 5 ("All owners/occupants and renters of residential property within the area bordered on

the west by Dale Ave, on the north by Lincoln Way Hwy, on the east by S Church St/Union St

(between Lincoln Way highway and E 13th St) and S Main St (between E 13th St and Dragoon

Trail), and on the south by Dragoon Trail." (bold emphasis omitted))). He attributes this revised

definition to his "pre-suit investigation" and "documents and information obtained during

discovery." (*Id.*). The proposed Class area in Brown's motion, however, still lacks

ascertainability.

"Usually, scientific or objective evidence closely ties the spread of the alleged [odors] to

the proposed class boundaries . . . ." *Burkhead*, 250 F.R.D. at 291. Here, however, there is no

preliminary scientific evidence to support the proposed Class area. The Preliminary Report and

Declaration reflect that Cal has not performed any AERMOD site-specific analysis in this case,

and further, that he does not know what such an analysis would show. (ECF 27-5; ECF 31-3 at

12, 31); *see Hamilton*, 2019 WL 9089916, at *3 ("[Cal's expert report] says only that AERMOD

would be capable of modeling odors within and around the class area. . . . He makes no opinion

about what those simulations will show or whether [the defendant's] emissions will correlate,

even roughly, with the proposed class area.").

In fact, Cal did not even review the Data Sheets when writing his Preliminary Report.

(ECF 31-3 at 16-17, 18 ("So did you know that th[e] map includes individuals who told

plaintiff's counsel they had no experience with odor problems? . . . No, I did not."), 19 ("I don't

know anything about the data sheets because I've never read them.")). Nor was he aware of the

air emission controls installed at the Facility. (*Id.* at 29 ("I know nothing about the Wellness Pet

facility."), 31). Consequently, Cal's expert opinion is of no assistance in clearly defining the

class "by objective criteria," *Mullins*, 795 F.3d at 657, because he "has not shown a connection

between the proposed [C]lass area and the odors released from [the Facility]," *Hamilton*, 2019

WL 9089916, at *1. *See Thornburg*, 2022 WL 4348475, at *5 ("[Cal's expert report] states only

that his model *can* show which properties may have been impacted. . . . Thus, his report does not

lend any support to Plaintiff's class definition." (citation omitted)); *Brockman,v. Barton Brands,

Ltd.*, No. 3:06CV-332-H, 2007 WL 4162920, at *4 (W.D. Ky. Nov. 21, 2007) ("Nowhere in

Plaintiffs' evidence has the Court found, for example, . . . any sort of analysis of where the

emissions of Defendant's plant spread once they leave Defendant's smokestack."). Thus, Cal's

Preliminary Report and Declaration inform the Court only that a scientific method *could* be used

to determine a more objectively defined proposed class in this case.

Given this lack of any preliminary scientific data, it is apparent that the proposed Class

area is based only on Brown's counsel's interpretation of the returned Data Sheets. Yet, the map

of the Class area still shows some pockets of areas where no Data Sheets were returned. (ECF 27

at 5). As such, there is no evidence that residents of these areas have experienced odor impact,

suggesting that the Class area could still be overly broad. *See Lloyd v. Covant Plymouth

Renewable Energy, LLC*, 585 F. Supp. 3d 646, 654 (E.D. Pa. 2022) ("Perhaps best demonstrating

the disconnect between Lloyd's proposed class and her evidence, . . . none of the survey

respondents lives between 1.25 and 1.5 miles of the Covanta facility. There is simply no

evidence that residents of that quarter-mile band are property included in the class."); *Brooks v.

Darling Int'l, Inc.*, No. 1:14-cv-01128-DAD-EPG, 2017 WL 1198542, at *7 (E.D. Cal. Mar. 31,

2017) ("[P]laintiffs' counsel based the definition of the class now proposed for certification, not

upon any preliminary finding made by their experts or upon a thorough analysis of a detailed

survey of those possibly impacted areas, but rather upon their own interpretation of the limited

information available to them.").

      Further, the proposed Class is not clearly defined because it lacks any temporal scope.

"To avoid vagueness, class definitions generally need to identify a particular group, *harmed*

*during a particular time frame*, in a particular location, in a particular way." *Mullins*, 795 F.3d at

660 (emphasis added) (citations omitted). As written, it is unclear whether the proposed Class

includes residents who have moved from the Class area. While Brown states in his reply brief

that the proposed Class refers to "current residents" in the present tense (ECF 34 at 8), his

proposed class definition should make that clear. Another possible wrinkle to the temporal scope

of the proposed Class definition, currently unaccounted for, is WellPet's plan to install its

IonO2x odor mitigation system in March 2023. (*See* ECF 33-1 at 22).

      In sum, it is Brown who bears the burden "to establish all of the requirements of class

certification, . . . [and] the serious inadequacy of the proposed class definition is reason enough

to deny the motion." *Humphrey v. Int'l Paper*, No. 02 C 4147, 2003 WL 22111093, at *5 (N.D.

Ill. Sept. 11, 2003) (R. & R.). Brown's failure to propose an ascertainable class definition

appears largely based on his decision to forego conducting any preliminary scientific testing

during the class certification phase of this case, and to rest instead on his argument that such

testing is reserved for the merits phase of the case. *See Brooks*, 2017 WL 1198542, at *8 ("[The

plaintiff's] failure [to adequately define the proposed class] would appear to be based at least in

part upon plaintiffs' decision not to conduct any preliminary scientific testing, or even to

undertake a thorough analysis of a detailed survey of those possibly impacted areas, for submission in support of their class certification motion and to rest instead on their argument that testing was relevant only to the merits phase of this litigation."). To reiterate, while this case has been bifurcated into Phase I and Phase II discovery, Brown as the plaintiff bears the burden to provide eligibility for class certification, *Bell v. PNC Bank, Nat'l Ass'n*, 800 F.3d 360, 371 (7th Cir. 2015), and this may "entail some overlap with the merits of [his] underlying claim." *Dukes*, 564 U.S. at 351.

Therefore, the motion for certification may be denied solely due to Brown's failure to clearly define the Class using objective criteria. However, for completeness of the record, and because the deficiency discussed above may be capable of being cured through the submission of results from preliminary scientific testing and a revised class definition in a subsequent motion for class certification, I will continue on to address the other Rule 23 requirements. *See, e.g.*, *Brooks*, 2017 WL 1198542, at *8; *Leib v. Rex Energy Operating Corp.*, No. 06-cv-802-JPG-CJP, 2008 WL 5377792, at *6 (S.D. Ill. Dec. 19, 2008).

3. Rule 23(a) Requirements

a. *Numerosity*

"To be eligible for certification, a proposed class must be so numerous that joinder of all the members as plaintiffs would be impracticable." *Shepherd v. ASI, Ltd.*, 295 F.R.D. 289, 296 (S.D. Ind. Nov. 18, 2013) (citing Fed. R. Civ. P 23(a)(1)). "Although there is no 'bright line' test for numerosity, a class of forty is generally sufficient to satisfy Rule 23(a)(1)." *Id.* (citation omitted).

Brown states that there are approximately 2,100 households within the Class area, and 50

households have submitted Data Sheets to his counsel expressing interest in the action. (ECF 27 at 14; ECF 27-2 ¶ 9; ECF 27-3; ECF 27-4 ¶ 6). Individuals submitting a Data Sheet had to sign it and "swear that the . . . answers are true and accurate to the best of [the signatory's] knowledge." (ECF 27-3); *cf. Lloyd*, 585 F. Supp. 3d at 655 (finding that the plaintiff had not satisfied numerosity due to, in part, the fact that the 29 survey responses complaining of odors were unsworn). While a few residents responded that they were not impacted by odors, they constitute a fairly small number—6 out of 56. *Cf. Lloyd*, 585 F. Supp. 3d at 654-55 (finding that the plaintiff had not satisfied numerosity due to, in part, the fact that 42 residents in the proposed class area responded that they had not been impacted by odors). Further, WellPet does not meaningfully challenge the numerosity requirement. (*See* ECF 33-1 at 23); *see, e.g.*, *Leib*, 2008 WL 5377792, at *6 (noting that the defendant did not challenge the numerosity of the proposed class). Given this record, I conclude that Brown has satisfied the numerosity requirement.

> ### b. Commonality

"To meet the commonality requirement, Rule 23(a)(2) requires that there be 'questions of law or fact common to the class.'" *T.V., ex rel. B.V. v. Smith-Green Cmty. Sch. Corp.*, 267 F.R.D. 234, 237 (N.D. Ind. 2010); *see also Hamilton*, 2019 WL 9089916, at *2. "This means that there has to be a common nucleus of operative facts and the defendants have engaged in 'standardized conduct' towards members of the proposed class." *T.V., ex rel B.V.*, 267 F.R.D. at 237 (quoting *Keele v. Wexler*, 149 F.3d 589, 594 (7th Cir. 1998)).

However, "it is not enough to simply raise a common question. An issue of fact or law is common only if it is capable of class-wide resolution." *Hamilton*, 2019 WL 9089916, at *2. (citing *Bell*, 800 F.3d at 374). "In other words, class certification is appropriate only if the

common questions have common answers, and if the plaintiff can demonstrate that the class members 'have suffered the same injury.'" *Id.* (quoting *Dukes*, 564 U.S. at 349-50). "Courts give Rule 23(a)(2) a 'highly permissive reading,' requiring plaintiffs to show only that there is more than one issue of law or fact in common." *Leib*, 2008 WL 5377792, at *6 (citations omitted).

"[E]ven when a claim as a whole cannot be resolved on a class-wide basis, Rule 23 allows an action to be 'brought or maintained as a class action with respect to particular issues.'" *Hamilton*, 2019 WL 9089916, at *2 (quoting Fed. R. Civ. P. 23(c)(4)). "Rule 23(b) requires only common evidence and common methodology, not common results." *Bell*, 800 F.3d at 379 (citation omitted). "The fact that the plaintiffs might require individualized relief or not share all questions in common does not preclude certification of a class." *Id.* (citations omitted). The commonality requirement "seeks only identification of a common issue the resolution of which will advance the litigation." *Burkhead*, 250 F.R.D. at 295 (citation and internal quotation marks omitted); *see also Powell v. Tosh*, 280 F.R.D. 296, 305 (W.D. Ky. 2012).

Here, Brown does identify a few common issues of fact to the proposed Class. For example, questions about WellPet's conduct in operating the Facility, how that conduct created emissions, and the extent of those emissions are common issues that if resolved, would advance the litigation. (ECF 27 at 15-16); *see Burkhead*, 250 F.R.D. at 295. But it is also quite evident that some elements of Brown's claims cannot be resolved on a class-wide basis. "Even if all class members were exposed to [WellPet's] odors, individual inquiries would be required to determine whether the odor was strong enough to interfere with the enjoyment of individual class members' property, or whether individual class members experienced an actual loss or damage." *Hamilton*, 2019 WL 9089916, at *2. As the record stands now, there is no preliminary

46

scientific evidence to link WellPet's alleged odors with the extent to which Class members are exposed to such odors. Therefore, on this record there is not sufficient evidence "to show that all residents and property owners within [the Class area] are similarly affected by [the Facility.]" *Powell*, 280 F.R.D at 306 (finding that the plaintiff's expert report using meteorological data, chemical data, and sensory data was sufficient evidence to show commonality for a proposed class near one hog barn, but that commonality was not shown for another proposed class near several barns because the expert used only extrapolated data and "ha[d] done nothing to verify" it).

Further, "the extent of damages, such as any diminution in real estate value [and interference with the use and enjoyment of property], will vary from person to person." *Hamilton*, 2019 WL 9089916, at *2. Given that some of the Class members own property and some lease, the Class members who own their residences will likely seek damages for both diminution in real estate value *and* interference with use and enjoyment, while tenants could only seek the latter damages. Further, any Class members who own property but do not reside in the Class area would presumably seek damages for only diminution in real estate value.

To further complicate matters, the record reflects that there is at least one other potential odor source near the Class area—the Mishawaka wastewater treatment plant. (ECF 32-9 at 19-20). The letters and Data Sheets inquired only about odors "from the WellPet facility." (ECF 27-3; ECF 32-5). Yet, two respondents specifically mentioned the wastewater treatment plant as well. *See* ECF 27-3 at 16 ("Seems to be wors[e] lately. But we live across from the Mish. waste treatment plant? Also we use[d] to get odor from [an] ethanol plant in South Bend. I believe its coming from WellPet now."), 45 ("In the springtime, odors are . . . equal [to] very pungent

wastewater smells."). To date, Brown has not presented any preliminary scientific evidence that the cause of all the Class members' damages can be attributed entirely to the Facility.

Yet, as explained earlier, courts are to give the commonality requirement "a highly permissive reading." *Leib,* 2008 WL 5377792, at *6. A plaintiff needs to "show only that there is more than one issue of law or fact in common." *Id.* (citations omitted). Without finding that *all* of the issues would be common to all Class members, and given that Brown has identified more than one question of law and fact "that ostensibly lend themselves to adjudication on a classwide basis," *Burkhead*, 250 F.R.D. at 295; (*see* ECF 15-16), I find that Brown satisfies the commonality requirement based on the Data Sheets despite the lack of preliminary scientific evidence. *See Burkhead*, 250 F.R.D. at 295, 300-01 (concluding that the plaintiff satisfied the commonalty requirement, yet still denying class certification).

### c. Typicality

"The question of typicality is closely related to the question of commonality." *Copeland v. Wabash Cnty., Ind.*, 338 F.R.D. 595, 604 (N.D. Ind. 2021) (citing *Rosario v. Livaditis*, 963 F.2d 1013, 2018 (7th Cir. 1992)). Typicality requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P 23(a)(3). "A plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and his or her claims are based on the same legal theory." *Bruzek v. Husky Oil Operations Ltd.*, 520 F. Supp. 3d 1079, 1094 (W.D. Wis. Feb. 19, 2021) (quoting *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)). "Typicality is determined with reference to the defendant's conduct and the plaintiff's legal theory," *Randolph v. Crown Asset Mgmt., LLC*, 254 F.R.D. 513, 518 (N.D. Ill. Dec. 11, 2008)

(citations omitted), "not particularized defenses the defendant may have against certain class members," *Schmidt v. Smith & Wollensky, LLC*, 268 F.R.D. 323, 327 (N.D. Ill. July 26, 2010) (citing *Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996)).

WellPet does not meaningfully dispute the typicality criterion in its response brief. (*See* ECF 33-1). The claims named by Brown and the proposed Class all arise from the same alleged conduct by WellPet—emission of noxious odors—and they all seek to recover under the same legal theories, negligence and nuisance. *See Lively v. Dynegy, Inc.*, No. 05-CV-00063-MJR, 2007 WL 685861, at *9 (S.D. Ill. Mar. 2, 2007) ("The requirement of typicality focuses on the conduct of a defendant and whether a proposed class representative has been injured by the same kind of conduct alleged against the defendant as other members of the proposed class." (citation omitted)); *see Mejdreck v. Lockformer Co.*, No. 01 C 6107, 2002 WL 1838141, at *2-4 (N.D. Ill. Aug 12, 2002) (finding typicality was satisfied in a nuisance and negligence case where the claims were all based on defendants' alleged pollution and the same legal theories, even though differences existed in the degree, effect, and fact of the pollution on individual property).

Given that typicality "is liberally construed," *Lively*, 2007 WL 685861, at *9 (citation omitted), and WellPet does not raise any specific argument challenging typicality, I find that this requirement, too, is sufficiently satisfied.

### d. Adequacy of Representation

"In order to be an adequate representative, the named plaintiff must 'be part of the class and possess the same interest and suffer the same injury as the class members.'" *Conrad v. Boiron, Inc.*, 869 F.3d 536, 539 (7th Cir. 2017) (quoting *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 625-26 (1997)). "[T]he court must be satisfied that the plaintiff will keep the interests

49

of the entire class at the forefront." *Id.* That is, "[a] class representative is adequate as long as its

claims do not conflict with, and are not antagonistic to the claims and interests of the class

members it seeks to represent." *Cunningham Charter Corp. v. Learjet, Inc.*, 258 F.R.D. 320, 329

(S.D. Ill. Apr. 27, 2009) (citing *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 598 (7th

Cir. 1993)). "The adequacy prerequisite also extends to class counsel, and requires that the court

select counsel that is best able to represent the interests of the class." *Id.* (citation and internal

quotation marks omitted).

    While Brown does not have apparent interests that are directly antagonistic to the

proposed Class, I still have doubts about whether he is an adequate class representative due to

his status as a month-to-month tenant in the Class area. *See id.* (expressing "serious doubt as to

whether [the plaintiff] could be an adequate representative," even though it did not appear to

have interests directly antagonistic to the proposed class members). The language of the

complaint contemplates two types of damages for the Class members: (1) those who suffered

interference with the ability to use and enjoy their property, and (2) those who have been harmed

by diminishing property values. (*See* ECF 7 ¶¶ 25, 26, 28, 39, 47, 52, 60, 62, 63, 68, 73).

    More than 70% of the respondents who returned Data Sheets own their property. (*See*

ECF 33-1 at 31 n.21 (citing ECF 27-3)). It is reasonable to presume, then, that more than 70% of

the Class would seek damages for diminution of property values. Brown, however, does not own

property within the Class area. Thus, he has no claim for—and no incentive to seek—damages

for diminished property value.[5] Given this circumstance, I have concerns whether Brown, acting

---

[5] WellPet also asserts that the adequacy of Brown's counsel's representation of the Class is "lacking in this case based on their handling of this case and others." (ECF 33-1 at 30). In doing so, he cites a 2022 case in which Brown's counsel "did not mark solicitation materials properly and violated New York's Rules of Professional Conduct." (*Id.* (citing *Britton v. Seneca Meadows, Inc.*, 203 A.D.3d 1583 (4th Dep't 2022)); *see* ECF 32-12).

as the sole Class representative, has "the ability and the incentive to vigorously represent the claims" of those Class members who are property owners. *Lloyd*, 585 F. Supp. 3d at 657 (citation omitted) ("[T]he linchpin of the adequacy requirement is the alignment of interests and incentives between the representative plaintiffs and the rest of the class." (citation omitted)).

4. Rule 23(b)(3) Requirements

Turning to whether the prerequisites of Rule 23(b)(3) are satisfied, Brown must show under Rule 23(b)(3) that "questions of law or fact common to [C]lass members predominate over any questions affecting individual [C]lass members, and that a class action is superior to other available methods of adjudicating the controversy." *Averett*, 2017 WL 4284748, at *5; *see also Messner*, 669 F.3d at 811. "[T]he 'predominance' and 'superiority' requirements of Rule 23(b)(3) serve to limit class certification to cases where 'a class action would achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Mitchell v. LVNV Funding, LLC*, No. 2:12-CV-523-TLS, 2015 WL 7016343, at *8 (N.D. Ind. Nov. 10, 2015) (second alteration in original) (quoting *Amchem Prods., Inc.*, 521 U.S. at 615). "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem*, 521 U.S. at 617 (citation omitted). "A class action solves this problem

---

Contrary to WellPet's assertion, I do not view these past violations in marking solicitation materials, standing alone, as sufficient to "raise serious doubt" that Brown's counsel will not adequately represent the Class in this case. *Cunningham Charter Corp.* 258 F.R.D. at 329. Other courts have acknowledged that Brown's counsel, Liddle Sheets Counsel P.C. (formerly known as Liddle & Dubin, P.C.), "is competent, and has extensive experience with previous class actions [involving alleged emission of noxious odors.]" *Averett v. Metalworking Lubricants Co.*, No. 1:15-cv-01509-JMS-MPB, 2017 WL 4284748, at *4 (S.D. Ind. Sept. 27, 2017); *see also Batties v. Waste Mgmt. of Pa., Inc.*, No. 14-7013, 2016 U.S. Dist. LEXIS 186335, at *47 (E.D. Pa. May 11, 2016) ("Class Counsel—from the Detroit-based firm Liddle & Dubin, P.C.—are among the few attorneys that specialize in class-action odor-nuisance litigation.").

by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor." *Id.* (citation omitted).

### a. Predominance

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Mitchell*, 2015 WL 7016343, at *9 (quoting *Amchem Prods.*, 521 U.S. at 623). That is, "[t]he predominance inquiry 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'" *Hostetler v. Johnson Controls, Inc.*, No. 3:15-CV-226 JD, 2018 WL 3868848, at *6 (N.D. Ind. Aug. 15, 2018) (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)). "While similar to Rule 23(a)'s requirements for typicality and commonality, the 'predominance criterion is far more demanding.'" *Bruzek.*, 520 F. Supp. 3d at 1095 (quoting *Messner*, 669 F.3d at 814); *see Cancel v. City of Chi.*, 254 F.R.D. 501, 511 (N.D. Ill. 2008) ("[P]redominance calls for a more rigorous inquiry than do commonality and typicality . . . ." (citation omitted)).

"Rule 23(b)(3)'s predominance requirement is satisfied when common questions represent a significant aspect of a case and . . . can be resolved for all members of a class in a single adjudication." *Messner*, 669 F.3d at 815 (alteration in original) (citation, brackets, and internal quotation marks omitted). "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages . . . ." *Hostetler*, 2018 WL 3868848, at *6 (alteration in original) (quoting *Tyson*, 577 U.S. at 453); *see Messner*, 669 F.3d at 815 ("It is well established that the presence of

individualized questions regarding damages does not prevent certification under Rule 23(b)(3)." (collecting cases)). "Thus, even if issues like causation and damages might require individual hearings for each claimant, a common issue that is central to each class member's claim . . . can be certified and resolved in a class-wide proceeding." *Hostetler*, 2018 WL 3868848, at *7 (collecting cases).

Brown contends that WellPet's alleged wrongful actions are the same across the Class—that WellPet's operation of the Facility was negligent and a nuisance, causing emission of noxious odors. He contends that "common evidence will be offered to establish the frequency, intensity, and dispersion pattern of [WellPet's] emissions" (ECF 27 at 20-21), and that Brown and the Class have common claims of loss of use and enjoyment of their property (ECF 7). But as the record stands now, there is no preliminary scientific evidence linking WellPet's emissions with all of the Class members' claims, given that Cal has not performed any preliminary scientific analysis to date. Rather, Brown solely relies on the Data Sheets, which are not particularly detailed and acknowledge at least one other potential cause of odors near the Class area. *See Lloyd*, 585 F. Supp. 3d at 658 ("[An alternative odor source] credibly raises the possibility that some of [the plaintiff's] neighbors have misattributed their odor impact to [the defendant] when in fact it was caused by a different nearby source.").

"[W]hat remains missing is any evidence that the *cause* of the entire class's damages could be determined in a single proceeding." *Burkhead*, 250 F.R.D. at 299. "[Brown] bear[s] the burden of producing something more than [the Class's] wholly subjective belief that their property is affected by [WellPet's] emissions and that all those in [the Class area] must be similarly affected." *Id.* at 300; *see also Brockman,* 2007 WL 4162920, at *10. "Mere *assertion*

53

by class counsel that common issues predominate is not enough." *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014).

And as discussed under the commonality requirement, "[e]ven if all [C]lass members were exposed to [WellPet's] odors, individual inquiries would be required to determine whether the odor was strong enough to interfere with the enjoyment of individual [C]lass members' property, or whether individual [C]lass members experienced an actual loss or damage." *Hamilton*, 2019 WL 9089916, at *2; *Lloyd*, 585 F. Supp. 2d at 658 ("Even if there were no possible other odor sources, odor impact will vary property-by-property. . . . First, odors dilute as they travel away from the source. . . . Second, odor impact will vary based on the direction and speed of the wind. . . . Third, a property's topography and physical features affect its odor impact.").[6] Likewise, the extent of damages will vary from person to person. *See Hamilton*, 2019 WL 9089916, at *2; *Burdette*, 2012 WL 405621, at *5, 7; *see also Parko*, 739 F.3d at 1086 ("Nor could it be assumed that every class member has experienced the same diminution in the value of his property even if every one has experienced the same level of contamination.").

As explained earlier, "Rule 23(b)(3)'s predominance requirement is similar [to commonality], but more demanding . . . ." *Hostetler*, 2018 WL 3868848, at *6. "Rule 23's requirements are not a mere pleading standard; a party does not meet those requirements by

---

[6] In *Lloyd*, an odors emissions case, the court found that though Lloyd satisfied the commonality requirement under Rule 23(a)(2), he failed to establish predominance under Rule 23(b)(3), explaining:

> To be sure, some elements of Lloyd's claims can be established on a class-wide basis, including whether Covanta's odor mitigation practices were reasonable and what level of odor impact constitutes an unreasonable invasion in Lloyd's community. On balance, however, the court finds that individualized determinations of causation, fact of damage, and extent of injury, considering the complex factors that affect odor impact, would overwhelm any common issues of Covanta's conduct. Thus, the court finds Lloyd has not established predominance under Rule 23(b)(3).

*Id*. at 659-60.

offering its assurance that it will be able to offer common proof." *Id.* at *16; *see Lloyd*, 585 F. Supp. 2d at 653 ("To determine if the requirements of Rule 23 have been satisfied, a district court must conduct a 'rigorous analysis' that requires it to look beyond the pleadings." (citation omitted)). That is what Brown does here—offer Cal's Preliminary Report and Declaration opining that Brown *may* be able to offer common proof in the future. That is not enough, even though the discovery in this case is bifurcated. *See Parko*, 739 F.3d at 1086 ("[The district judge] treated predominance as a pleading requirement. He thought it enough at this stage that the plaintiffs *intend* to rely on common evidence and a single methodology to prove both injury and damages . . . . But if intentions (hopes, in other words), were enough, predominance . . . would be out the window.").

Consequently, on the current record, which lacks any preliminary scientific evidence connecting emissions from the Facility to the proposed Class, I cannot conclude that "questions of fact and law common to the [C]lass relating to the operation of the [Facility] predominate over issues affecting the individual [Class members]." *Greene v. Will*, No. 3:09CV510-PPS/CAN, 2013 WL 12309515, at *5 (N.D. Ind. Jan. 29, 2013). Brown has not carried his burden of establishing the predominance requirement.

### b. Superiority

Rule 23(b)(3) also requires a showing that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "This requirement is satisfied if 'a class action would achieve economies of time, effort, and expense and promote . . . uniformity of decisions as to persons similarly situated, without sacrificing fairness or bring about other undesirable results.'" *Bruzek*, 520 F. Supp. 3d at 1099 (alteration in

original) (quoting *Amchem*, 521 U.S. at 615); *see also Mitchell*, 2015 WL 7016343, at *8. To

determine superiority, the Court considers:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

Some of these considerations weigh in favor of superiority here. The Class members'

"interests in individually controlling the prosecution or defense of separate actions" is likely

minimal. *Id.* There is no report that any Class member has already begun individual litigation

against WellPet. (ECF 27 at 23). And damages are likely "not so significant as to make pursuit of

individual claims likely." *Mitchell*, 2015 WL 7016343, at *10. Further, this is a desirable forum

for this litigation given that all the Class members are likely in the Northern District of Indiana.

*See Brown v. Kerkhoff*, 279 F.R.D. 479, 499 (S.D. Iowa 2012) (observing that all of the class

members were in Iowa favored superiority).

Nevertheless, "the failure to show predominance spills over into superiority." *Ginardi v.

Frontier Gas Servs., LLC*, No. 4:11-cv-00420-BRW, 2012 WL 1377052, at *5 (E.D. Ark. Apr.

19, 2012). Brown has not to date produced any preliminary scientific evidence showing that the

liability issue is common to the class "and can be resolved in one stroke." *Kleen Prods. LLC v.

Int'l Paper*, 306 F.R.D. 585, 605 (N.D. Ill. 2015) (citation omitted); *Burkhead*, 250 F.R.D. at 299

("Plaintiffs have alleged that Defendant's operations result in extensive emissions, but what

56

remains missing is any evidence that the *cause* of the entire class's damages could be determined in a single proceeding."); *Brockman*, 2007 WL 4162920, at *9 (same). On the record presented, "the need for individual inquiries into causation and injury undercuts any benefit class treatment could provide." *Lloyd*, 585 F. Supp. 3d at 660; *see Reed v. Advocate Health Care*, 268 F.R.D. 573, 595 (N.D. Ill. 2009) ("If individual issues predominate, then class certification is usually not a superior method for resolving the controversy, since management of such issues by a court will not be efficient." (citation omitted)). Therefore, as with predominance, I find that Brown has not satisfied the superiority requirement under Rule 23(b)(3).

In sum, because Brown has not established issues of law or fact common to the proposed Class that predominate over questions affecting individual Class members, and has not shown that the proposed Class is ascertainable with reference to objective criteria, I conclude that Brown's motion for class certification should be denied. However, Brown "could potentially cure this deficiency by submitting AERMOD simulations, or some other preliminary testing, and class area based on that information" in a second motion for class certification. *Hamilton*, 2019 WL 9089916, at *5 (citing *Brooks*, 2017 WL 1198542, at *8). Therefore, I recommend that Brown's motion for class certification be denied without prejudice.

## VII. CONCLUSION

For the foregoing reasons, I RECOMMEND that:

(a)     Defendant's Unopposed Motion to Amend (ECF 33) be GRANTED;

(b)     Defendant's Motion to Strike Improper Supplemental Expert Report of Mark Cal (ECF 38) be GRANTED as to the impermissible legal conclusions reached in the second sentence of paragraph 9, the first portion of paragraph 10, the last sentence of paragraph 24, and the last portion of paragraph 35; but that the motion otherwise be DENIED;

(c)     Defendant's Motion to Exclude Plaintiff's Expert, Dr. Mark P. Cal (ECF 30) be DENIED;

(d)     Plaintiff's Motion to Exclude Defendant's Expert, Tony Schroeder (ECF 40) be DENIED; and

(e)     Plaintiff's Motion for Class Certification (ECF 26) be DENIED WITHOUT PREJUDICE.

The Clerk is directed to send a copy of this Report and Recommendation to counsel for the parties. NOTICE IS HEREBY GIVEN that within 14 days after being served with a copy of this recommended disposition a party may serve and file specific, written objections to the proposed findings or recommendations. Fed. R. Civ. P. 72(b). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER. *See Brokaw v. Brokaw*, 128 F. App'x 527, 530 (7th Cir. 2005); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

Entered this 31st day of March 2023.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge

58